**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**WHITE PLAINS DIVISION**

| | |
|---|---|
| **EDUCATIONAL & GOVERNMENTAL EMPLOYEES FEDERAL CREDIT UNION,**<br><br>*Plaintiff,*<br><br>-against-<br><br>**FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC., and FISERV, INC.,**<br><br>*Defendants.* | Case No: 26-CV-2402<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Represented by NERKO PLLC and HECHT PARTNERS LLP, plaintiff Educational & Governmental Employees Federal Credit Union ("**Educational FCU**"), alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**"):

## PRELIMINARY STATEMENT

1.      Educational FCU is a not-for-profit credit union. Fiserv, one of the world's largest providers of outsourced technology to financial institutions, sold itself to Educational FCU as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information.

2.      Educational FCU brings this action and seeks relief to prevent ongoing and irreparable harm caused by Fiserv's deficient and misrepresented cybersecurity practices. Fiserv falsely represents that it employs appropriate safeguards to protect sensitive and confidential financial data of Educational FCU's credit union members. Fiserv fails to implement basic industry

1

standard controls, leaving Educational FCU's systems and member information vulnerable to unauthorized access.

3. Fiserv has also misrepresented that it provides Educational FCU with secure and reliable core processing services. Educational FCU entrusted Fiserv with the processing, safeguarding, and reconciliation of sensitive financial transactions and member account data through Fiserv's core banking systems. Fiserv, however, failed to implement and maintain reasonable and appropriate security controls designed to protect the integrity of transaction processing and account records. Specifically, Fiserv failed to maintain adequate safeguards to ensure that transactions were accurately recorded and reconciled. As a result, improperly processed transactions entered the processing environment and were recorded in Educational FCU's account records. Because Fiserv's system served as the platform responsible for recording member transactions and maintaining account balances, these failures directly corrupted Educational FCU's books and records.

4. Because Fiserv alone possesses the systems, transactional data, and technological capability necessary to reconcile Educational FCU's accounts, monetary damages alone cannot remedy the harm caused by Fiserv's breaches. Unless Fiserv performs the reconciliation and corrective work required to restore the integrity of Educational FCU's books and records, Educational FCU will continue to face operational disruption, regulatory risk, and harm to its members.

5. As such, the risks to Educational FCU are not hypothetical—they are present and continuing.

6. Under its Master Agreement, Fiserv pledged to protect Educational FCU's data with the same high-tech safeguards Fiserv uses for its own information and in full compliance with

federal standards. But the reality was starkly different. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls. They easily expose consumer data. And Fiserv kept selling them—while falsely assuring Educational FCU and its other financial institution customers that everything was secure.

7. Fiserv's double standard makes the breach unmistakable. For its own corporate data, Fiserv deploys layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For Educational FCU's systems, Fiserv withheld these protections. Instead, it relied on authentication methods so weak and susceptible to hacking that federal standards expressly do not permit their use.

8. Educational FCU cannot fix these security and processing failures on its own. Fiserv controls the systems that store and process Educational FCU's data. As long as those systems remain inadequately secured, Educational FCU's systems remain unsecured and Educational FCU faces ongoing hacking risks. Each day that passes without proper controls compounds that risk.

9. Fiserv has converted its own security failures into an upsell opportunity. If Educational FCU seeks to leave and transfer its data to a safer provider, Fiserv would demand seven-figure "early termination" and deconversion fees as the price of release, and because Educational FC's books and records are inaccurate, there would be no assurance that the issues would even be corrected if Fiserv is replaced. Fiserv's ultimatum is clear: pay the ransom, or leave your data exposed on systems Fiserv refuses to adequately secure.

10.     In sum, Fiserv has attempted to monetize its own security failures by forcing credit unions to choose between paying to escape unsafe systems or paying again for ostensible security services that do not provide proper protection.

11.     This is Fiserv's business model. According to *The Wall Street Journal,* Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited small financial institutions and the customers they serve. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal*, April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of *The Wall Street Journal* article.

12.     Educational FCU brings this action to recover damages and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects Educational FCU's members.

### PARTIES

13.     Plaintiff Educational FCU is a federally chartered, not-for-profit credit union in New York. Educational FCU has a principal place of business at 333 N. Central Ave., Hartsdale, New York, 10530.

14.     Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

15.     Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

16.     At all relevant times, each defendant acted as the agent of the other defendant and within the scope of that agency. Each defendant acted with the other defendant's authority, knowledge, consent, and ratification of the acts and omissions alleged in this Complaint.

## JURISDICTION AND VENUE

17.     This Court has original subject-matter jurisdiction over Educational FCU's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over Educational FCU's state-law claims 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18.     Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

19.     This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

## FACTUAL BACKGROUND

20.     Educational FCU is a not-for-profit, member-owned financial institution serving over 6,300 members in the Westchester County, New York area. Educational FCU offers a range of banking and financial services for individuals, including checking accounts, savings accounts and money markets, savings certificates (CDs), individual retirement accounts (IRAs), debit and credit cards, online banking, and loan products (such as home loans, car loans, and personal loans). Educational FCU was chartered in 1937, to serve governmental and school employees in Westchester. With over $50 million in assets and serving thousands of members, Educational FCU is a community-focused financial institution.

21.     Educational FCU's members include employees of educational institutions such as school districts, colleges, and related entities, in Westchester County, employees of local county, or state government agencies in Westchester County, and the immediate family members of eligible employees. It is a professionally managed financial institution offering personalized service and a wide array of financial services.

22.     Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

23.     Educational FCU contracted with Fiserv to provide technology services under a Master Agreement dated December 15, 2020. **Exhibit 2** are true and correct copies of the Master Agreement and an amendment dated April 5, 2024.

24.     Fiserv stores and processes Educational FCU's most sensitive information, including member names, dates of birth, Social Security Numbers, banking account numbers,

balances, transaction histories, and other highly sensitive, personally identifying information, across various Fiserv systems.

25. **Contractual Standard of Care.** Under the Master Agreement, Fiserv was required to follow the following standards of care:

a. Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to prevent unauthorized disclosure of information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (**Exhibit 2** at § 3(b).)

b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

    i. "protect the security and confidentiality of customer information;"

    ii. "protect against any anticipated threats or hazards to the security or integrity of such information;"

    iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer;" and

    iv. "ensure the proper disposal of 'consumer information.'" (**Exhibit 2** at § 4(a).)

26. Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls, in addition to phishing-resistant multi-factor authentication.

27. Fiserv's *Cybersecurity Fact Sheet 2025*, *Standard Information Gathering Questionnaire*, and *SOC 1 Type 2 Report* assert that Fiserv employs robust cybersecurity program, including the implementation of multi-factor authentication (MFA) as part of its security strategy. These documents outline Fiserv's commitment to industry standards and regulatory requirements, including National Institute of Standards and Technology ("NIST") and International Organization for Standardization ("ISO") frameworks.

28. Fiserv's *Cybersecurity Fact Sheet 2025* (a true copy of which is annexed hereto as **Exhibit 3**) states that Fiserv "has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications. ... The policy and supporting standards have been designed to meet applicable industry and regulatory requirements, including... National Institute of Standards and Technology (NIST) Cyber Security Framework, 800-53, 800-63-3." (**Exhibit 3** at 3.)

29. In Fiserv's *Standard Information Gathering Questionnaire* (a true copy of which is annexed hereto as **Exhibit 4**), Fiserv was asked "Is Multi-factor Authentication deployed?" Fiserv responded, "Yes." (**Exhibit 4** at row H.8.)

30. As described in the *SOC I Type 2 Report: Financial Institution Group – Core Account Processing Solutions – Credit Union Solutions' ASP and In-House Products* (a true copy of which is annexed hereto as **Exhibit 5**), Fiserv requires its employees accessing Fiserv's systems to use "two-factor authentication that includes a token-generated one-time code." (Id. at 107.)

31. **What Educational FCU Received.** Despite these contractual obligations, Fiserv failed to implement these equivalent protections for Educational FCU's confidential information. Instead, Fiserv deployed materially weaker controls.

32.    **Why MFA Matters.** MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (such as a password), possesses (such as a device or token), or is (such as a biometric verification). MFA is a common method to mitigate threats like data theft, ransomware, and account fraud. Possessive or identification factor authentication solutions, such as app-based authenticators, cryptographic keys, biometrics, and hardware-based authentication, in addition to knowledge-based authentication (such as a username, password, and answer to a user-generated challenge question) provide security for high-risk transactions, such as those that allow transfers of funds to third parties or provide access to nonpublic personal information.

33.    Not all MFA is created equal. Some forms, such as codes sent by email or text, do not establish possession of a particular device. Those forms provide inadequate security because they are susceptible to hacking by interception, SIM-swap, or account takeover.

34.    Federal standards and supervisory guidance reinforce these differences. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial Institution Services and Systems*[1] adopts the *Digital Identity Guidelines* of the NIST, which mandates: "Methods that do not prove possession of a specific device, such as . . . email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.[2] This further requires that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

35.    A July 2025 update to NIST's *Digital Identity Guidelines* (a true copy of which is annexed hereto as **Exhibit 6**) reinforces that codes sent by email are insufficient to provide proper

---

[1] https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf.
[2] https://pages.nist.gov/800-63-3/sp800-63b.html.

MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

- Access using only a password

- Interception in transit or at intermediate mail servers

- Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."[3]

36.    Codes sent by text message are not secure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation."[4] This is because it is fairly simple to intercept or redirect text messages, so a text message code is insufficient to satisfy the "what you have" factor. Text messages are transmitted without encryption, making them vulnerable to network-level compromise.

37.    On at least one system housing Educational FCU's confidential information, Fiserv has not required any MFA or email passcode challenge at all.

38.    For other systems housing Educational FCU's confidential information, Fiserv relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. It therefore fails to meet the standard of care Fiserv owes under the Master Agreement.

39.    On at least one other access path, Fiserv uses codes sent over text message, based on user selection. Text message codes are insufficient to satisfy the possession factor of MFA. As

---

[3] https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63B-4.pdf.
[4] https://www.cisa.gov/sites/default/files/2023-01/fact-sheet-implementing-phishing-resistant-mfa-508c.pdf

the above federal regulatory guidance explains, text message codes are a temporary bridge to stronger, phishing-resistant MFA. Fiserv deploys stronger possession-based MFA such as token- or app-based authenticators to protect Fiserv's own confidential information but fails to provide equivalent protections to Educational FCU.  This breaches the Master Agreement.

40.    Fiserv's failure to deploy promised safeguards has resulted in Educational FCU paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to Educational FCU's extraordinarily sensitive confidential information.

***Fiserv's Pattern: Known Security Gaps, False Assurances, and Active Concealment***

41.    Fiserv has long known that the authentication controls on its systems sold to financial institutions suffer from serious security defects. Yet Fiserv continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remained secure. Fiserv's knowing and willful misconduct—a combination of knowledge of security problems, false assurances its systems had certain security controls, and concealing the absence of security controls—amounts to fraud.

42.    Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed Educational FCU's member information to compromise by hackers and forced Educational FCU's—and other institutions—to operate under hidden, avoidable risk.

11

43.   In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[5]

44.   Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

45.   Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a fix.

46.   Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

---

[5] "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

47.    Fiserv's lackadaisical approach to cybersecurity persists to this day.

48.    Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, even one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to another *Krebs on Security* article about additional security problems with Fiserv's online banking platform, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[6] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." That public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

49.    For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

50.    In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York (the "Court

---

[6] Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives-and the lines have blurred." *See* https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

Credit Union"), discovered security problems with Fiserv's online-banking applications. In particular, the Court Credit Union found that Fiserv's authentication controls were weak and could easily be bypassed, allowing Court Credit Union online banking accounts to be hacked.

51.     This hacking raised significant additional concerns for the Court Credit Union and its members—Federal judges, U.S. Marshals and Court employees. A hacker of the Court Credit Union would be able to access nonpublic personal information and transaction history, such as a member's home address and usage patterns for a debit card. Such information could facilitate stalking, harassment or other criminal conduct directed at those members.

52.     The Court Credit Union decided to terminate its relationship with Fiserv largely on account of these security failures.  Fiserv demanded an early-termination fee before it would permit Court Credit Union to terminate its relationship.

53.     The Court Credit Union sued Fiserv over the online-banking security failures that Fiserv refused to address and to challenge Fiserv's asserted early-termination fee when the Court Credit Union decided to exit Fiserv for a more secure system while undergoing a merger with another credit union. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, Case No. 1:22-cv-09329 (S.D.N.Y. 2022).

54.      Fiserv resolved the case shortly after it was filed. But Fiserv's prioritization of early termination fees and maintaining leverage over the Court Credit Union instead of fixing security problems prolonged the exposure of the Credit Union's members—judicial personnel and U.S. Marshals—to the risk of hacking.

55.     Other litigation raising security concerns includes: *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:19-cv-00624-RJC (W.D. Pa. 2019); *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025);

*Self Help Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 1:25-cv-01112-TDS-LPA (M.D. N.C. 2025); *FiCare Federal Credit Union v. Fiserv Solutions, Inc. et al.*, Case No. 8:26-cv-00231-JLB-TGW) (M.D. Fla. 2026); and *POLAM Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-02352 (C.D. Cal. 2026).

56.     In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv failed to dispossess itself of the records, the credit union filed a motion for injunctive relief compelling Fiserv to return the records.

57.     In response, Fiserv unequivocally represented to the Bessemer Court it had fully returned the credit union's records, which was central to the court's denial of injunctive relief. Fiserv falsely represented to the Court that it had provided the credit union with "a complete set of" the requested records. *See* Letter dated June 26, 2019, at 2 (a true copy of which is annexed hereto as **Exhibit 7**). Specifically, Fiserv's opposition to a preliminary injunction filed with the court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." Id.

58.     The Bessemer court denied an injunction, based on Fiserv's assurances that the credit union's records had been returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26.

59.     Later, Fiserv provided the credit union with hundreds of records that Fiserv previously assured the Bessemer court it had already returned—confirming that Fiserv misled the credit union's counsel and the court.

15

60.    Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv actively concealed defects from becoming known to its clients. When Bessemer System Federal Credit Union reported security problems that allowed online banking accounts to be readily taken over by hackers, Fiserv demanded that the credit union "[r]efrain from dissemination or disclosure of any information or records relating to the 'security review' to third parties, including any clients…of Fiserv." Those threats and misconduct did not protect Fiserv's customers; it protected Fiserv's reputation and revenue.

**Fiserv Defrauds Its Financial Institution Customers, Including Educational FCU**

1.    *Fiserv Provides a Fraudulent "Compliance Package" to Financial Institutions Misrepresenting the Security Controls Fiserv Has on Its Systems*

61.    As a regulated financial institution, Educational FCU must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv provides its financial-institution customers a "Compliance Package" that represents Fiserv has implemented security measures to meet financial-institution regulatory requirements.

62.    Fiserv updates its compliance package from time to time and assures Educational FCU that Fiserv continues to comply with evolving regulatory and industry requirements. The representations in Fiserv's compliance package were false and misleading.

63.    Among the materials in Fiserv's compliance package is Fiserv's *Standard Information Gathering Questionnaire*. Educational FCU and other Fiserv customers use this questionnaire to assess Fiserv's security posture and vendor risk.

64.    The questionnaire asks: "Are policies and standards based on accepted control standards, frameworks, and industry practices?"

16

65.    Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

- Examinations by the U.S. Federal Banking Agencies (FBA), a formal interagency body representing financial institution regulators, including the Office of the Comptroller of the Currency (OCC), the Federal Deposit Insurance Corporation (FDIC), the Board of Governors of the Federal Reserve System (FRB)

- EU General Data Protection Regulation (GDPR)

- Gramm-Leach-Bliley Act (GLBA)

- Health Insurance Portability and Accountability Act (HIPAA)

- State-specific privacy and security laws

- International Organization for Standardization (ISO) 27001, Information Security Management

- National Institute of Standards and Technology (NIST) Cyber Security Framework

- Payment Card Industry Data Security Standard (PCI DSS)

66.    Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

67.    The questionnaire also asks: "Is Multi-factor Authentication deployed?" Fiserv answered: "Yes."

68.    That statement was false and misleading. As described above, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

69.    Fiserv also provided Educational FCU with a *Fiserv Cybersecurity Fact Sheet 2025* (referenced *supra*), which again represented that "Fiserv has established a Global Cybersecurity

and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard."

70. The *Fiserv Cybersecurity Fact Sheet 2025* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3."

71. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

72. Fiserv's *Global Data Ethics and Privacy Program Fact Sheet 2023* represents that Fiserv that adopted privacy principles – regardless of location – which use "appropriate security safeguards" and "[r]ecognizes the importance of data privacy and holds [Fiserv] accountable to [its] data protection standards." Those statements were false and misleading, Fiserv fails to adequately use MFA leaving sensitive accounts exposed and fails to meet applicable industry and regulatory standards including NIST standard.

### 2. *Fiserv Publishes a False and Misleading Privacy Notice*

73. Fiserv, Inc. publishes a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions.[7]

---

[7] A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

74. In Section 6, Fiserv represents: it has "in place appropriate security measures to prevent . . . personal data from accidentally being lost, used or accessed in an unauthorized way, altered or disclosed."

75. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent Educational FCU's data from being used or accessed in an unauthorized way.

76. Fiserv's misrepresentations and concealments harmed Educational FCU in a straightforward way: it deprived Educational FCU of material facts that would have altered Educational FCU's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

77. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

78. Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

79.     Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

80.     That course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award of punitive damages.

81.     As a direct result, Educational FCU has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

### 3.     *The Severe Impact on Educational FCU and Its Members*

82.     The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems.

83.     The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

84.     Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

85.     Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of a member's lives, including, for example, which members paid retainers to a divorce attorney, or which

20

members received care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic.

86.     Public reporting has recognized the hidden emotional toll of data breaches, a unique form of irreparable harm. While some victims report direct financial impacts, many more—50%—report emotional harm. Nearly one-third said a breach had affected their physical well-being, and nearly a quarter said their relationships were personally affected. Data breaches can expose diagnoses, medical procedures, and other highly sensitive personal information while leaving victims living with persistent anxiety: when will criminals use my data, and how? *See* "The Hidden Emotional Toll on Victims of Data Breaches," *The Wall Street Journal*, Nov. 25, 2025, https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. **Exhibit 8** is a true and correct copy of *The Wall Street Journal* article.

87.     Criminals can also use Educational FCU's member information to fuel embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to Educational FCU:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly,

21

> individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit....
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[8]

88.     To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[9]

89.     Stolen data can also be offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal

---

[8] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

[9] *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

90. Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

91. In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

92. The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

93. Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the hack going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

94. Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of the breach may not be immediately apparent. Indeed, in order

to protect its member information, Educational FCU will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

> *4.      Educational FCU Delivers a Notice of Breach and Requests Information Pursuant to the Master Agreement; Fiserv Ignores Its Obligations*

95.      Educational FCU has experienced many security and technological deficiencies in Fiserv's products during the course of the Master Agreement.  In light of these material problems, Educational FCU conducted a review of the security controls Fiserv provides to Educational FCU.

96.      Educational FCU's review identified that compliant MFA was not implemented on Educational FCU's online banking website and mobile application used by members to conduct online banking activities.

97.      The Client360 system, which is used by credit union and Fiserv employees for service tickets, change orders, and communications that can include confidential information and requests affecting system security, also did not have proper MFA implemented. This system has a periodic email or text-delivered passcode.

98.      The security review also identified that other systems used by credit union employees to host confidential information were not protected by proper MFA, including: Portico, Nautilus Essentials, Portico Reporting Analytics, Wisdom Accounting Suite, xChange, ID Verification, Loancierge, Relationship Manager, Source Capture Solutions, and Originate (Deposit Essentials).

99.      Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely manner, Educational FCU sent Fiserv a Notice of Breach on or about March 5, 2026. A copy of the Notice of Breach is annexed hereto as **Exhibit 9**.

100.     In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that those breaches be remedied, Educational FCU also exercised its rights under the

Master Agreement for information concerning Fiserv's performance (or lack thereof). Specifically, Educational FCU's requests included:

    a.    Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

    b.    Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required § 10(b) of the Master Agreement;

    c.    Copies of Fiserv's most recent security certifications for the service centers providing services to Educational FCU, as required by § 3(d) of the ASP Services Exhibit to the Master Agreement;

    d.    Copies of the independent audit reports of the Fiserv service centers providing service to Educational FCU, as required by § 3(f) of the ASP Services Exhibit to the Master Agreement; and

    e.    Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 5(c) of the ASP Services Exhibit to the Master Agreement.

101.    By letter dated March 9, 2026, Fiserv responded to Educational FCU's request for audit documentation by referring Educational FCU to a previous August 28, 2025 Information Security Plan, while refusing to provide invoice audit documentation required under Section 10(b) "unless and until Educational FCU identifies the specific products and services for which it believes it was improperly invoiced and charged[,]" arguing that a "blanket" request would not be reasonable. Given Fiserv's failures that led to the corruption of Educational FCU's books and records, a request for invoice audit documentation related to all of the products and/or services

used by Educational FCU, is both reasonable and a contractual obligation under the Master Agreement. Educational FCU A copy of Fiserv's response is annexed hereto as **Exhibit 10**.

102.    To date, Fiserv has not provided other documents in response to Educational FC's audit request.

> ***5.    Educational FCU's Claims Are Timely, as Both the Statute of Limitations and Contractual Limitations Period Have Been Tolled***

103.    Educational FCU exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[10]

104.    Educational FCU became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

105.    Educational FCU previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

106.    The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

107.    Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading Educational FCU.

108.    In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

109.    Fiserv was actually aware of the material defects in its systems, and its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and

---

[10] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

actively concealed from Educational FCU the risks associated with the defects of its products and services, and that these defects caused damages and harm to Educational FCU.

110.    Fiserv's purpose in concealing these facts was to induce Educational FCU to continue relying on its services and to delay Educational FCU's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent Educational FCU from initiating legal action within the applicable limitations period.

111.    Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

112.    Educational FCU was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

113.    Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing Educational FCU to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

114.    For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation

and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

## FIRST CLAIM FOR RELIEF
**Breach of Contract: Monetary Damages**
**(Against Fiserv Solutions Only)**

115. Educational FCU repeats and re-alleges the allegations set forth in paragraphs 1-114 above.

116. The Master Agreement is a valid contract binding Fiserv Solutions.

117. In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

118. Educational FCU has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

119. Fiserv Solutions materially breached the Master Agreement, including by:

   a. violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to prevent unauthorized disclosure of Educational FCU's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

28

b.   failing to maintain accurate records for Educational FCU, causing Educational FCU to be in an "out of balance" condition;

c.   violating Sections 3(a), 3(d), 3(f) and 5(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to Educational FCU;

d.   violating Section 10(b) of the Master Agreement by refusing to provide Educational FCU with documentation supporting the amounts invoiced by Fiserv; and

e.   violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing Educational FCU to hacking, fraud, and recordkeeping risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

120.   Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully insecure and have led to significant fraud losses and hacking at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its systems. Nor did Fiserv Solutions alert Educational FCU of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to Educational FCU's rights.[11]

---

[11] New York public policy bars parties from contracting away liability for gross negligence, even in business-to-business contracts signed by sophisticated parties. The limitation-of-liability clause in the Master Agreement therefore offers Fiserv no protection because its failure to fulfill its obligation to secure Educational FCU was, at a minimum, grossly negligent. In *Abacus Federal Savings Bank v. ADT Security Services, Inc.*, 967 N.E.2d 666, 670 (N.Y. 2012), New York's highest court held that a financial institution could recover full, uncapped damages from a security vendor whose gross negligence left the institution not secured. Fiserv's misconduct here is no less grave. The same principle applies, and the damages here are not subject to any contractual cap.

29

121. Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that puts the life savings and extraordinarily sensitive financial information of scores of consumers into the reach of hackers. By withholding basic safeguards from Educational FCU's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And Educational FCU is not alone: Fiserv's deficient approach to cybersecurity for its clients has also endangered countless other financial institutions and their customers. Fiserv's misconduct is actionable as an independent tort as well as egregious, repeated, and directed at Educational FCU as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

122. As a direct and proximate result of Fiserv Solutions' contract breaches, Educational FCU has suffered and will continue to suffer damages and harm.

## SECOND CLAIM FOR RELIEF
### Breach of Contract: Specific Performance
### (Against Fiserv Solutions Only)

123. Educational FCU repeats and re-alleges the allegations paragraphs 1-114 above.

124. The Master Agreement is a valid contract binding Fiserv Solutions.

125. Educational FCU has performed or substantially performed its obligations under the Master Agreement, except for those, if any, that were waived or excused by Fiserv Solutions.

126. Educational FCU is ready, willing, and able to perform its remaining obligations until the contract terminates or is rescinded by an order of this Court.

127.    Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to accurately report Educational FCU's information and safeguard Educational FCU's confidential information.

128.    Fiserv is capable of performing the Master Agreement, including by maintaining accurate records for a financial institution and by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

129.    Fiserv serves as the core data processing and account management provider for Educational FCU, maintaining and controlling the systems through which Educational FCU's member accounts, general ledge entries, and transaction records are processed and stored.  Under the Master Agreement, Fiserv undertook the obligation to accurately process, maintain, and reconcile Educational FCU's account data.

130.    Because Fiserv alone possesses the systems, transactional data, and technological capability necessary to reconcile Educational FCU's accounts, monetary damages alone cannot remedy the harm caused by Fiserv's breaches. Unless Fiserv performs the reconciliation and corrective work required to restore the integrity of Educational FCU's books and records, Educational FCU will continue to face operational disruption, regulatory risk, and harm to its members.

131.    The loss of data integrity and confidentiality, and the risk of unauthorized access and false reporting of financial institution account records, constitute irreparable harms not adequately compensable by money damages alone.

132.    Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to specifically perform its obligations to Educational FCU, including securing

Educational FCU's confidential information as required by the Master Agreement and providing complete and accurate account records and information to Educational FCU.

**THIRD CLAIM FOR RELIEF**
Rescission[12]
**(Against Fiserv Solutions Only)**

133.    Educational FCU repeats and re-alleges the allegations set forth in paragraphs 1-114 above.

134.    Educational FCU may have the Master Agreement rescinded due to Fiserv's breaches. The breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left Educational FCU in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

135.    Educational FCU may have the Master Agreement rescinded because Fiserv misrepresented to Educational FCU the existence and nature of Fiserv's security controls. These representations were material to Educational FCU, and it reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Educational FCU.

136.    Educational FCU may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by Educational FCU have altered the essential nature of the Master Agreement, and Educational FCU has been unable to obtain its expected bargain from Fiserv.

---

[12] As permitted by Fed. R. Civ. P. 8(a)(3), Educational FCU is demanding different types of relief, including in the alternative, on its breach of contract claim.

137.    Educational FCU has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Relief**
**(Against Fiserv Solutions Only)**

138.    Educational FCU repeats and re-alleges the allegations set forth in paragraphs 1-114.

139.    Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

140.    **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy).** Educational FCU is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent, intentional, fraudulent, tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

141.    **No Obligation to Pay Outstanding Accounts Receivable (AR) or Future Invoices.** Educational FCU disputes any obligation to pay the outstanding AR or future invoices on the grounds that:

a. Fiserv's material breaches and repudiation excuse further performance by Educational FCU;

b. Fiserv's failure of consideration discharges Educational FCU's payment obligations;

33

    c.  Fiserv's prior material breach and repudiation bars enforcement of the Master Agreement's payment provisions; and

    d.  The Master Agreement is subject to rescission.

2.    **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy).** Educational FCU is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

    a.  Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent performance, failure of consideration, commercial impracticability, frustration of purpose.

    b.  The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

    c.  The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why Educational FCU may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce Educational FCU into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent

34

Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against Fiserv Solutions Only)**

142.    Educational FCU repeats and re-alleges the allegations set forth in paragraphs 1-114 above.

143.    Fiserv Solutions induced Educational FCU to pay it by issuing invoices. These invoices, delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

144.    In reality, Fiserv Solutions' invoices overstated the amounts Educational FCU owed, and Fiserv Solutions withheld material facts about the security and other deficiencies in its systems. Fiserv Solutions' systems were so insecure and inaccurate that they were not even minimally suitable for storing a regulated credit union's confidential information.

145.    As a result of this misconduct, Educational FCU mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

146.    Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require Fiserv Solutions disgorge and make restitution of the amounts Educational FCU paid, with interest.

**SIXTH CLAIM FOR RELIEF**
**Defend Trade Secrets Act**
**(18 U.S.C. § 1836, *et seq.*)**

147.    Educational FCU repeats and re-alleges the allegations in paragraphs 1-114 above.

35

148. Educational FCU is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. Educational FCU's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

149. Educational FCU's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

150. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

151. Educational FCU has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and in accordance with the policies, procedures, and commitments announced by Fiserv.

152. Educational FCU has invested substantial resources in developing and protecting its trade secrets. Educational FCU's trade secrets provide it with economic advantages over its competitors.

153. Fiserv knew or should have known that Educational FCU's information at issue comprised Educational FCU's trade secrets.

154. Fiserv misappropriated and continued to misappropriate Educational FCU's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to Educational FCU the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to Educational FCU, it would not have furnished its trade

secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

155. At the time of Fiserv's use and disclosure of Educational FCU's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to Educational FCU to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

156. Fiserv's misappropriation of Educational FCU's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from Educational FCU.

157. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

158. Fiserv's misappropriation was willful and malicious, entitling Educational FCU to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

159. As a direct and proximate result of Fiserv's misappropriation of Educational FCU's trade secrets, Educational FCU has suffered and will continue to suffer damages and harm.

## SEVENTH CLAIM FOR RELIEF
### Fraud

160. Educational FCU repeats and re-alleges the allegations in paragraphs 1-114 above.

161. Fiserv fraudulently misrepresented its data security practices and knowingly concealed their profound deficiencies. Relying on these deceptive assurances, Educational FCU entrusted Fiserv with highly sensitive confidential information, a trust Fiserv intentionally violated.

37

162. As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect Educational FCU's confidential information.

163. As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement, including by withdrawing security features mid-contract.

164. Likewise, statements in Fiserv's *SOC 1 Type 2 Report* were false and misleading when made. At the time Fiserv furnished the *SOC I Type 2 Report* to Educational FCU, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *SOC 1 Type 2 Report*, including the NIST framework. Nor is the Fiserv cybersecurity program built on the NIST framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including all associated updates.

165. Statements in the *Fiserv Cybersecurity Fact Sheet 2025* further fraudulently represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

166. Moreover, Fiserv's failure to implement multi-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived Educational FCU about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded Educational FCU while placing thousands of members at risk.

38

167. Even after being directly confronted about this fraud, Fiserv continues the deception. On March 5, 2026, counsel for Educational FCU sent a demand letter to Fiserv explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. *See* **Exhibit 9**. Rather than implementing the promised security measures, Fiserv responded by disputing its breach.

168. Fiserv's continued failure to provide two-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

169. Further, independent of any specific misrepresentations made by Fiserv, Educational FCU reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of Educational FCU's information and Educational FCU is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to Educational FCU that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, and their ability to safely store and process Educational FCU's information, and the security measures and services that have been provided to Educational FCU. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including

by threatening another Fiserv customer who uncovered a security problem with litigation); (d) Fiserv's failure to comply with its own policies, notices, and agreements. justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine Educational FCU's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by Educational FCU.

170.    Educational FCU reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

171.    Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to Educational FCU, and were made with the intent of misleading Educational FCU into relying upon them, and Educational FCU did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Educational FCU.

172.    By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded Educational FCU, including fraudulently inducing Educational FCU to contract with, and continue to receive services from, Fiserv.

173.    As a direct and proximate result of Fiserv's fraud, Educational FCU has suffered and will continue to suffer damages and harm.

### JURY TRIAL DEMAND

Educational FCU requests a trial by jury of all issues so triable.

**DEMAND FOR RELIEF**

WHEREFORE, Educational FCU respectfully requests that the Court enter final judgment on the Complaint in favor of Educational FCU and against Fiserv and grant the following relief:

(i)       **Monetary damages**, including, without limitation, restitutionary, compensatory, consequential, incidental, reliance, statutory, and punitive—all in amounts to be determined at trial.

(ii)       **Specific performance** compelling Fiserv to perform its obligations to Educational FCU, including systemic reconciliation of Educational FCU's account balances and related issues;

(iii)       **Rescission of the Master Agreement**, unwinding the parties' relationship;

(iv)       **Restitution and disgorgement**, restoring Educational FCU to the status quo ante, including, without limitation, recovery of amounts Educational FCU paid to Fiserv under the Master Agreement for services that were materially deficient, nonconforming, or rendered valueless by Fiserv's breaches and repudiation;

(v)       **Indemnification** of Educational FCU's losses;

(vi)       **Declaratory relief** declaring the parties' respective rights and obligations in connection with the Master Agreement;

(vii)       **Preliminary and permanent injunctive relief** protecting Educational FCU against additional harm;

(viii)       **Costs of litigation**, including, without limitation, Educational FCU's attorneys' fees and costs, and the maximum prejudgment and post judgment interest allowed by law; and

(ix)       **Any further relief** that may be necessary to achieve justice.

41

Dated: March 24, 2026

Respectfully submitted,

*/s/ Charles J. Nerko*

Charles J. Nerko
John C. Cleary
Walter E. Swearingen
**NERKO PLLC**
1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

Lori G. Feldman
David H. Hecht
Tiffany Wong
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
lfeldman@hechtpartners.com
dhecht@hechtpartners.com
twong@hechtpartners.com
888.421.4529

*\* Pro hac vice application forthcoming.*

Kristen L. Nelson\*
**HECHT PARTNERS LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, California 90067
212.851.6821
knelson@hechtpartners.com

*Attorneys for Plaintiff*
*Educational & Governmental Employees*
*Federal Credit Union*